UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
CENTRAL FLORIDA LIQUIDATION AND :
SALES, LLC and L & M ENTERPRISES :
USA, LLC, individually and on behalf of all :
others similarly situated, :
 :
                               Plaintiffs, :      CIVIL ACTION NO.
 :
v. :      _____
 :
 :
EVO PAYMENTS INTERNATIONAL, LLC, :      **Jury Trial Demanded**
and EVO MERCHANT SERVICES, LLC, :
 :
                              Defendants. :
-----------------------------------------------------------x

## CLASS ACTION COMPLAINT

Plaintiffs Central Florida Liquidation and Sales, LLC and L & M Enterprises USA, LLC, by and through their undersigned counsel, on behalf of themselves and the class of persons and entities preliminarily defined below, submit this Class Action Complaint and allege the following based on personal knowledge, investigation of counsel, and information and belief:

## INTRODUCTION

1. This is a civil action seeking monetary damages and declaratory and injunctive relief against Defendants EVO Payments International, LLC and EVO Merchant Services, LLC (collectively, "EVO") arising from EVO's assessment of improper and excessive fees for credit and debit card processing.

2. In today's business world, the vast majority of merchants accept payment for goods and services via credit and debit cards. Indeed, because the majority of customer payments are made via credit and debit cards, acceptance of such payments is necessary for most merchants to survive in the marketplace.

3. In order to accept this method of payment, the merchant is required to utilize a payment processing service.

4. Merchants rely on the companies that provide such services to do so at a fair price. Indeed, for some businesses, fees for card processing services are the third highest expense merchants incur, following labor and product costs.

5. The card processing system can be a difficult one to understand, with many parties involved. For instance, in addition to the merchant which receives payment and the customer who provides such payment, the processing of a card transaction involves several other parties:

   a. <u>The Card Issuer</u> – the company that issued the credit or debit card to the customer, which is typically a bank such as Chase or Bank of America, and which charges a fee whenever a customer uses one its cards for a transaction. These banks charge fees that are usually calculated as a percentage of a transaction plus a per-transaction fee (e.g., 1.65% + $0.10/transaction). This fee varies based on the type of card used. For example, the card issuers will charge a higher fee for transactions involving a rewards credit card than a card with no rewards program. These fees are generally known as "interchange rates."

   b. <u>The Card Network</u> – the card networks (i.e., Visa, MasterCard, Discover) also charge per transaction fees. By way of example only, Visa assesses a set fee known as the "APF" ("Acquirer Processing Fee"), and MasterCard charges a set fee known as the "NABU" ("Network Access Brand Usage") fee. The card networks also charge various additional fees depending on the type and nature of a given transaction.

   c. <u>The Payment Processor</u> – this is the entity that actually processes the payment through the card network and ensures that whenever a customer pays for an item or

service with a credit or debit card the customer's account is debited and the merchant's account is credited. EVO is a payment processor.

d. <u>The Member Bank</u> – only banks, such as Deutsche Bank or HSBC, may be members of card networks. These member banks "sponsor" payment processors so they may process transactions through the card networks.

e. <u>The Merchant Acquirer</u> – this is the entity which – in conjunction with Independent Sales Organizations ("ISOs") – markets the payment processor's services to merchants. ISOs are sometimes referred to as Merchant Services Providers ("MSPs"). Merchant acquirers and ISOs essentially act as a "middle man" between merchants and payment processors. They enroll merchants in payment processing services and then are usually supposed to provide customer support to the merchant and handle monthly billing. Defendant EVO declares itself a "registered ISO and MSP of Deutsche Bank, AG." It can also be described as a merchant acquirer because it acquires merchants from other ISOs. EVO claims it "is among the largest fully integrated merchant acquirer and payment processors in the world," meaning it can both sign up merchants and actually perform the back office processing of their card transactions. Most providers do not wear both of these hats.

6. Ordinarily, a merchant that desires to accept credit and debit cards as a form of payment obtains such services through an ISO or merchant acquirer. For convenience, the term "merchant acquirer" is used below.

7. At the outset of their relationship, the merchant and the merchant acquirer reach consensus on the fees and charges the merchant will pay for payment processing services. Such fees and charges can take a variety of forms, including "per item" fees, fees based on a percentage of the transaction amount, and monthly or annual fees.

3

8. After terms are accepted and processing begins, the merchant acquirer (in conjunction with the payment processor) sends monthly billing statements to the merchant that reflect the prior month's activity and specify the fees imposed.

9. The number of involved parties, moving pieces, and the formatting of monthly billing statements can make it difficult for small and medium-sized merchants to understand whether the fees they are being charged are proper. Large merchants, by contrast, sometimes devote the resources to ensure that their charges are in line with those they agreed to pay.

10. Unfortunately, some merchant acquirers take advantage of this confusion. They induce "mom and pop" merchants to use their services with the promise of low, straightforward pricing, but once the parties are doing business, they sneak in new fees and mark-ups.

11. These additional fees are often imposed in a deceptive fashion, such that it is very difficult for merchants to even notice them. Moreover, even if a merchant does notice the new or increased charges, they are labeled in such a manner to appear as though they are required by law or by one of the card networks. In reality, however, these improper fees are being assessed for the sole purpose of raising additional revenue and profit at the merchant's expense.

12. For many years, Defendants have perpetrated this scheme. Recently, two EVO agents and affiliates were indicted on charges of mail and wire fraud and stand accused of imposing fees on merchant customers that far exceeded those set forth in customer agreements. *See* Indictment in Case No. 17-CRIM-248 (S.D.N.Y.) (Exh. 1 hereto). These purported fraudsters worked for entities majority-owned by EVO. EVO is described as the "Parent Company" in the indictment. For years, EVO and the indicted individuals worked closely together and signed up over 12,000 merchants. The victims were then assessed higher fees and charges than agreed-upon through EVO automated systems. EVO made tens of millions of

dollars based on these practices. More importantly, the same practices described in the indictment were not limited to the 12,000 customers signed up by the purported fraudsters. Rather, EVO jacked up the fees of other customers in the same manner. As just one example among many, EVO has charged a bogus "IRS Reporting" fee to many of its 500,000 customers, even customers that were not signed up by the New York fraudsters.

13. This case challenges the amount and nature of the payment processing fees that Defendants impose. Such fees violate the express terms of EVO's "Merchant Processing Agreement," as well as the covenant of good faith and fair dealing.

## **JURISDICTION AND VENUE**

14. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d)(2) because there are more than 100 potential class members and the aggregate amount in controversy exceeds $5 million exclusive of interest, fees, and costs, and at least one class member is a citizen of a state other than New York.

15. This Court has personal jurisdiction over Defendants because they are registered to transact business in New York and have engaged in a continuous and systematic course of doing business in New York by offering their services to thousands of New York merchants and citizens. Further, the North American headquarters of Defendants is located in Melville, Suffolk County, New York. Although Defendants also have operations elsewhere, including a world headquarters in Atlanta, their New York facilities are extensive.

16. Venue lies within this judicial district under 28 U.S.C. § 1391 because Defendants have their headquarters here and conduct substantial business in this district, and a substantial portion of the events, omissions, and acts giving rise to the claims herein occurred in this district. Moreover, Defendants' form contract with Plaintiffs and the class specifies this Court as the proper forum.

## THE PARTIES

17. Plaintiff Central Florida Liquidation and Sales, LLC ("CFLS") is a former customer of EVO. CFLS is a Florida limited liability company that sells fixtures to retail stores. CFLS is headquartered in Orlando, Florida.

18. Plaintiff L & M Enterprises USA, LLC ("L&M") is a former customer of EVO. L&M is an Iowa limited liability company that sells specialty firearms and custom knives. L&M is headquartered in Cedar Rapids, Iowa.

19. Defendant EVO Payments International, LLC ("EVO Payments") is a Delaware limited liability company that is registered to do business in New York. According to its website, EVO Payments:

> is the largest privately held payment processor and acquirer for merchants, Independent Sales Organizations (ISOs), financial institutions, government organizations, and multinational corporations throughout the United States, Canada, and Europe. EVO processes $50 billion in transactions annually and actively services over 500,000 merchant customer businesses.

EVO Payments' global headquarters is located in Atlanta, Georgia, but its North American headquarters is in Melville, New York. According to Bloomberg and other media outlets, EVO has put itself up for sale with an asking price in the $2 billion range.

20. Defendant EVO Merchant Services, LLC ("EVO Merchant Services") is a Delaware limited liability company that is registered to do business in New York. EVO Merchant Services is a subsidiary of EVO Payments and provides payment processing services to EVO Payments customers located in the United States.

# FACTUAL ALLEGATIONS

## A. EVO Induces Merchants to Enter Long Term Contracts Via Promises of Transparent, Low Cost Pricing.

21. EVO and its affiliates approach and market to merchants in an attempt to induce them to switch their payment processing to EVO through promises of transparent, low cost pricing. Merchants are attracted by promises of being able to save money by reducing the costs they would pay for payment processing services if they switched providers. This approach is very appealing to merchants because payment processing is a substantial business expense for them.

22. EVO provides prospective merchants with the form Merchant Application which identifies the fees and charges to which the merchant will be subject if it decides to enroll in Defendants' services. Many of these fees are negotiable.

23. The Application thus informs the merchant in clear terms what it will be charged if it agrees to enroll in EVO's services and how such charges will be calculated. The Merchant Application is not merely an advertisement, but is part and parcel of the deal.

24. This transparency is very important because the Agreement typically extends for a set period of time (such as an initial term of three years). If a merchant desires to end its relationship with EVO prior to the expiration of this term, it often must pay an early termination fee of several hundred dollars.

25. Those merchants that are interested in doing business with EVO for the specified fees identified in the Merchant Application sign it, as does the merchant's personal guarantor, usually the small business owner.

26. EVO contends that by signing the Merchant Application, the merchant is binding itself to what is often a separate document – the "Merchant Processing Agreement" ("the

Terms"). Collectively, the Merchant Application and Terms are referred to hereinafter as "the Agreement" or "the contract."

27. The Terms are a boilerplate form that is not negotiable and is presented to the merchant on an adhesive, take-it-or-leave-it basis. It consists of tiny, non-descript font occupying many densely-worded paragraphs over several pages. Several different versions of the Terms have been used by EVO and its affiliates and predecessors over the last several years.

28. The Terms represent a unilateral effort by EVO to give itself the power to backtrack from the rates and fees set forth in the Agreement and to immunize itself from liability for its improper practices.

29. EVO uses the Terms, as well as the hefty early termination fees, as tools to discourage aggrieved merchants from terminating their relationships with EVO or pursuing legal action for overcharges.

**B.    EVO Raises Fees and Imposes New Categories of Fees Not Reflected in the Application.**

30. After EVO begins providing payment processing services, almost immediately it begins increasing charges and cramming merchants with fees that are inconsistent with the agreed-upon charges that are prominently set forth in the Application.

31. Indeed, Defendants increase agreed-upon rates and add new categories of fees that are not referenced in the Application.

32. EVO knows that if it disclosed these substantial additional fees in the Applications, merchants would be much less likely to do business with EVO. Instead, EVO crams merchants with these unanticipated fees after the relationship has commenced and merchants are "locked in" to long term deals that are only terminable upon payment of hefty penalties.

33. EVO describes these fees in a very misleading fashion so as to preclude merchants from realizing the fees are improper or that EVO, as opposed to the card networks or the government, is responsible.

34. EVO seizes these additional amounts from merchant bank accounts before merchants even know they are gone. Even if merchants could effectively decipher EVO's monthly statements, by the time merchants receive such statements, EVO has already debited the identified amounts from merchant bank accounts.

C.  **EVO's Activities Spawn Prosecution.**

35. EVO's practice of contracting for low cost, transparent pricing only to deceptively jack up fees and charges after locking merchants is not only contemptible, but it is criminal in some instances.

36. On May 2, 2017, two individual agents of "Commerce Payment Group" ("CPS") were indicted on mail and wire fraud. *See* Indictment in Case No. 17-CRIM-248 (S.D.N.Y.). CPS is one of the many subsidiaries that EVO has used to acquire merchants for its payment processing business. CPS is *majority-owned* by EVO, which is described as the "Parent Company" in the indictment. The indictment states that CPS and its affiliates acquired more than 12,000 merchant customers on behalf of EVO.

37. The agents stand accused of committing mail and wire fraud and conspiracy to commit mail and wire fraud by, among other things, (a) advertising low payment processing fees despite knowledge that that actual fees would be much higher, (b) inducing merchants to sign Applications identifying fees that were not the actual fees that would be assessed, (c) concealing the Terms from merchants, and (d) imposing fees that were much higher than those that had been advertised and disclosed in the Applications.

38. As made clear by paragraph 11 of the indictment, as the majority owner of the purported fraudsters' various companies EVO reaped millions of dollars in improper payment processing fees as a result of these unlawful actions. None of this money has been refunded to merchants. Similarly, none of the identical fees assessed against EVO's non-CPS customers across the country have been returned.

D. **EVO's Practices Have Harmed Plaintiffs and the Class.**

39. EVO's wrongful overbilling policies and practices described above harmed Plaintiffs and members of the class proposed below.

40. CFLS and L&M are former merchant customers of EVO that were victimized by EVO's overbilling practices during the relevant period. Based on the applicable New York law, it is likely that the class period will extend for six years before the filing of this case, or a related case that is already pending before the Court.

41. As one example of EVO's improper practices, CFLS's Merchant Application specified it would be charged the following discount rates: 1.65% for Visa and MasterCard credit transactions and 1.69% for Discover credit transactions. Nonetheless, CFLS was routinely charged higher rates for these transactions, such as 1.73% for Visa, MasterCard, and Discover credit transactions.

42. Moreover, CFLS was assessed certain "pass through" fees that are mentioned nowhere in the Application, such as access fees and assessments imposed by the card networks (e.g., "MC NABU", VISA AUTH ACCESS FEE," "VISA AUTH ACCESS DEBIT," "VISA ASSESSMENTS," "MASTERCARD ASSESSMENTS," etc.). As a "discount rate" customer (as opposed to an "interchange plus" customer) CFLS never agreed to pay such "pass through" fees. Even if it had, CFLS certainly would not have agreed to pay more than the standard actual

cost of such "pass through" fees.  Nonetheless, EVO routinely inflated these supposedly "pass through" fees.

43.     CFLS was also assessed junk fees that are not identified in the Merchant Application, such as "EPSD WATS" fees.

44.     L&M was also subjected by EVO to inflated discount rates.  For instance, rather than the agreed discount rate of 2.15% for credit cards, L&M was routinely charged higher rates, which were often in excess of 4.0%.

45.     Like CFLS, L&M was also subjected by EVO to unauthorized assessments and access fees that were greater than the amounts set by the card networks.

46.     L&M was also subjected by EVO to junk fees not authorized by its Merchant Application, including "PCI-DSS REGULATIONS UPDATE," "PCI-DSS NONCOMPLIANCE," and "GROSS VS. DAILY DISCOUNTING" fees.  These are the same type of fees mentioned in the New York criminal indictment.  Even after L&M terminated its relationship with EVO, EVO made up another new fee by threatening to apply a $95 monthly fee to deplete the remaining balance in L&M's reserve account.

47.     Finally, other fees that were noted in L&M's Application were improperly inflated, for example the "monthly service fee" was increased from $10 to $11.

48.     EVO automatically deducted the improper fees referenced herein from Plaintiffs' accounts before Plaintiffs received the monthly statement showing the fee.  Thus, any payment of such fees by Plaintiffs was not voluntary.

49.     Even if Plaintiffs had received the statements in a timely fashion, this is not a simple case where readily accessible information would have easily put Plaintiffs on notice they were being overcharged.

50. First, the statements do not separately identify "pass through" fees from those imposed solely by EVO – such line items are all mixed together. Thus, determining whether a fee should be checked against the Application or the "pass through" fee schedules published by the card networks is often impossible. This is especially true because the fee codes on the statements are often given different names than those set forth in the Application and the fee schedules. EVO often lists fees as being in the amount of ".00" on monthly statements even though a fee is actually charged and collected as part of aggregated totals listed later on the statements.

51. Moreover, a single credit card transaction often involves many different fees, making it even more difficult to compare published rates with those appearing on a statement.

52. Additionally, Defendants often buried cryptic language in prior monthly statements purporting to indicate that the card networks (as opposed to EVO) were raising or varying the charges noted in the Application. Thus, to determine if they were being overcharged, Plaintiffs would arguably have to check the charges against every prior monthly statement (in addition to the Application and the card network fee schedules).

53. Plaintiffs anticipate presenting evidence from industry experts that it is extraordinarily difficult for merchants to understand invoices from payment card processors, which are in many ways even more incomprehensible than the explanations of benefits sent to patients by health insurers. The amount of work needed by a merchant to understand the details of an EVO statement, even if possible, can be extraordinary.

54. These descriptions are intended only as illustrations of EVO's overcharges. Plaintiffs are not in possession of complete information as to many of the charges imposed upon them. Discovery will likely reveal other examples of Plaintiffs being overcharged.

55. As a consequence of Defendants' overbilling policies and practices, Plaintiffs and the members of the class proposed below have been wrongfully forced to pay unauthorized fees and charges. Defendants have improperly deprived Plaintiffs and the members of the proposed class of significant funds, causing ascertainable monetary losses and damages.

## CLASS ALLEGATIONS

56. Plaintiffs bring this action on behalf of themselves and all others similarly situated.

57. The Class is defined as:

> All EVO merchant customers in the United States that paid a fee or charge that was not authorized in the Merchant Processing Application.

58. Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate and as the Court may otherwise allow.

59. Excluded from the Class are EVO, its parents, subsidiaries, affiliates, officers, and directors, any entity in which EVO has a controlling interest, all customers who make a timely election to be excluded, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

60. The time period for the Class is the number of years immediately preceding the date on which this Complaint is filed (or the filing date of a related case already pending) as allowed by the applicable statute of limitations, going forward into the future until such time as Defendants remedy the conduct complained of herein. As described above, it is likely that the relevant period will begin in 2010 based on New York law.

61. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can meet all the applicable requirements of Federal Rule of Civil Procedure 23(a) and

(b)(3) and can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

62. **Numerosity.** The members of the Class are so numerous that individual joinder of all the members is impracticable. On information and belief, there are thousands of merchants that have been damaged by Defendants' wrongful conduct as alleged herein. The precise number of Class members and their addresses is presently unknown to Plaintiffs, but may be ascertained from Defendants' books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, and/or published notice.

63. **Commonality and Predominance.** Numerous common questions of law and fact exist as to the claims of Plaintiffs and the other Class members. Such questions include, but are not limited to:

    a. Whether EVO has acted and continues to act improperly by imposing excessive and unauthorized fees on merchants, including Plaintiffs and the other Class members, for EVO's own benefit;

    b. Whether EVO deceptively formats notices and monthly statements in order to mask the origin and imposition of unauthorized fees and charges;

    c. Whether EVO debits amounts from merchant accounts before they have a legitimate opportunity to object;

    d. Whether EVO has breached its contract with Plaintiffs and the other Class members, either directly or via the covenant of good faith and fair dealing;

e. Whether certain of the Terms are invalid exculpatory clauses, violate public policy, lack mutuality, are procedurally and substantively unconscionable, and are otherwise void and unenforceable;

f. Whether EVO is liable to Plaintiffs and the other Class members for imposing improper fees on merchants for EVO's own benefit; and

g. Whether EVO should be enjoined from engaging in any or all of the unfair practices complained of herein.

64. Other questions of law and fact common to the Class include:

a. The proper method or methods by which to measure damages; and

b. The declaratory and/or injunctive relief to which the Class is entitled.

65. EVO has engaged in a common course of conduct toward Plaintiffs and the other Class members. The common issues arising from this conduct that affect Plaintiffs and the other Class members predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

66. **Typicality.** Plaintiffs' claims are typical of the other Class members' claims because, among other things, all of the claims arise out of a common course of conduct and assert the same legal theories. Further, Plaintiffs and members of the Class were comparably injured through the uniform misconduct described above.

67. **Adequacy of Representation.** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members; Plaintiffs have retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiffs intend to prosecute this action vigorously. Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

68. **Declaratory and Injunctive Relief.**  EVO has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive and declaratory relief, as described below.

69. **Superiority.**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and each of the other Class members are small compared to the burden and expense that would be required to individually litigate their claims against EVO, thus rendering it impracticable for Class members to individually seek redress for EVO's wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CLAIM FOR RELIEF

### BREACH OF CONTRACT INCLUDING BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

70. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

71. The actions taken by EVO have materially violated the specific terms of its contracts with Plaintiffs and the Class.  Further, EVO has breached the contract by violating the covenant of good faith and fair dealing.  EVO is liable for the losses of Plaintiffs and the Class that have resulted from its breaches of contract.

72. EVO violated the contract by assessing improper charges not provided for in the contract, to include improperly inflated charges, additional fees not even mentioned in the contract, and by unilaterally marking up agreed-upon fees and charges without legal basis and without proper notice. Thus, EVO has materially breached the express terms of its own form contract.

73. Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the contracts, or those obligations have been waived by EVO.

74. Plaintiffs and the Class sustained damages as a result of EVO's breaches of contract.

75. The law also imposes upon each party to a contract the duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute violations of good faith and fair dealing in the performance of contracts.

76. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

77. By charging fees that are inconsistent with those laid out in the contract, including but not limited to, increasing the amounts of agreed-upon fees and imposing new categories of fees not referenced in the contract, EVO has violated the spirit of the contract and breached the covenant of good faith and fair dealing. Even if EVO believed that it had given itself contractual

discretion to increase mark-ups and fees, or add new fees, such discretion is constrained by good faith and fair dealing and EVO's actions do not comport with this duty.

78. Plaintiffs and the Class have performed all, or substantially all, of the obligations imposed on them under the contract. There is no legitimate defense for EVO's conduct.

79. Plaintiffs and members of the Class sustained damages as a result of EVO's direct breaches of the contract and Defendants' breaches of the covenant of good faith and fair dealing.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class demand a jury trial on all claims so triable and judgment as follows:

1. Certifying this case as a class action pursuant to Federal Rule 23;

2. Granting declaratory and injunctive relief as set forth herein;

3. Awarding damages in an amount to be determined by a jury;

4. Awarding pre-judgment interest at the maximum rate permitted;

5. Awarding such other relief as this Court deems just and proper.

Dated: August 1, 2017

Respectfully submitted,

WEBB, KLASE & LEMOND, LLC

By: */s/ E. Adam Webb*
E. Adam Webb*
 Georgia Bar No. 743910

1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
Adam@WebbLLC.com

*Attorneys for Plaintiffs*

* Motion for *Pro Hac Vice* Admission to be filed after case number assigned